JOURNAL ENTRY AND OPINION
Appellant, M.B., appeals from the judgment of the Cuyahoga County Court of Common Pleas, Juvenile Division, committing her minor twin children to the permanent custody of appellee, Cuyahoga County Department of Children and Family Services (CCDCFS). For the reasons that follow, we affirm.
On July 27, 2000, shortly after their birth, the twins were removed from appellant's custody by CCDCFS. On July 28, 2000, CCDCFS filed a complaint alleging the children were dependent and requesting a disposition of permanent custody to CCDCFS. On July 31, 2000, the children were committed to the pre-dispositional temporary custody of CCDCFS. On December 20, 2000, appellant admitted to an amended complaint and the children were adjudicated dependent. On June 19, 2001, the case proceeded to trial regarding disposition.
Arlene Zemba, a CCDCFS social worker, testified at trial that CCDCFS received a referral when the children were born regarding appellant's inability to provide appropriate care for them. Upon investigation, CCDCFS learned that appellant had two older children who had previously been removed from her care and committed to the permanent custody of CCDCFS. The oldest, J.B., was committed to the permanent custody of CCDCFS in November, 1994, and the second child, T.D., was committed to the permanent custody of CCDCFS in October 1995. Based upon appellant's history, the children were removed from appellant's custody five days after their births and placed in the custody of CCDCFS.
Zemba testified further that CCDCFS developed a case plan for appellant to enable the children to be returned to her custody. Appellant's case plan objectives included learning proper parenting skills, obtaining and maintaining stable housing, obtaining a psychological evaluation and addressing her emotional and mental health issues through individual counseling services.
Zemba testified that to facilitate completion of appellant's case plan objectives, she referred appellant to the Beechbrook Parent Education Program. According to Zemba, appellant took six months to complete the four-month program because her attendance was inconsistent. Terry Davis, supervisor of the Parent Education Program, testified that although appellant attended the number of sessions required to complete the program, her end-of-course rating in most categories was "fair," "needed work" or "poor" and, therefore, appellant did not successfully complete the program. During appellant's end-of-course interview, Sonia Wilson, appellant's teacher at Beechbrook, discussed the problems with appellant and suggested that she participate in several other parenting programs. Zemba testified that she, too, told appellant that she should enroll in further parenting classes. Appellant told Zemba that she did not care to attend additional classes, however, and never enrolled in any other classes.
Zemba testified that the second objective of appellant's case plan — stable housing — was included in the plan because appellant was living in an efficiency apartment with two other people when the children were removed from her custody. In addition, appellant had a history of failing to maintain stable housing. Her failure to do so, in fact, was one of the factors that led to the termination of her parental rights regarding her older children. Zemba testified that to assist appellant in meeting this objective, she referred her to the May Dugan Social Services Center. Zemba testified that appellant met with a representative from May Dugan only one time, however, and did not follow up on any of its referrals.
Zemba testified that she also referred appellant to May Dugan to obtain individual counseling to address her emotional and mental health issues. Zemba testified that appellant never utilized the counseling services that May Dugan offered, however, and at the time of the permanent custody hearing, was not receiving any individualized counseling services.
Zemba testified that in the eleven months following the removal of the children from her care, appellant had lived in at least five different places. When the children were removed from her custody, appellant lived in a one-bedroom apartment with two other adults. She lived there for approximately one and a-half months and then moved to a motel. After a short stay in the motel, she returned to the one-bedroom apartment for a short period of time, then moved in with her boyfriend's mother for approximately one and a-half months and, finally, moved to a two-bedroom apartment. Zemba testified that appellant did not keep her apprised of where she was living and that she did not know where appellant was living at the time of the custody hearing. According to Zemba, appellant had not met her case plan objective of obtaining and maintaining stable housing.
Zemba testified further that she made arrangements for appellant to visit her children while they were in the custody of CCDCFS. According to Zemba, the visits were to occur at the Westside Community House on a bi-weekly basis. The visits were subsequently moved to the Metzenbaum Center for Children, however, after appellant threatened to bring a gun to the visits and forcibly take her children away. Zemba testified that appellant missed five visits and was at least a half-hour late for two other visits.
In addition, appellant repeatedly brought people who had no relationship to the children to the visits. Zemba told appellant in December 2000, that such individuals were not allowed to attend the visits and should not attend. She also told appellant that if other individuals accompanied her to the visits, the visits would be canceled due to safety concerns. Nevertheless, appellant continued to bring guests to the visits. Accordingly, Zemba had to cancel three of the scheduled visits.
Dr. Thomas Anuszkiewicz testified that in February 2001, he completed a mental status examination of appellant. He also conducted a personality test, obtained a written self-report from appellant and reviewed background information provided by CCDCFS regarding appellant's case. In light of his examination of appellant and review of the other materials, Dr. Anuszkiewicz concluded that appellant lacked an understanding of how to raise children, had poor judgment in terms of independent living skills and did not have appropriate insight into the seriousness of her problems. In addition, according to Dr. Anuszkiewicz, the personality test results indicated that appellant was insecure, lacked self-esteem, was deficient in social skills, thought in a bizarre and fragmented manner, utilized poor judgment and had a tendency to respond to stress and pressure by withdrawing into fantasy.
Dr. Anuszkiewicz further determined that appellant suffered from a dependent personality disorder, which made it difficult for her to make everyday decisions and required others to assume responsibility for her. According to Dr. Anuszkiewicz, appellant would require two to three years of counseling before significant progress could be made regarding her emotional and mental health issues. Dr. Anuszkiewicz testified that appellant was not able to adequately care for her children at that time and that it would take at least two, and perhaps three, years before she was able to care for them at even the bare minimum level.
Sue Frankowski, an early intervention specialist with the Cuyahoga County Board of Mental Retardation and Developmental Disabilities, testified that the children were born one month premature and A.S. suffered from developmental disabilities, including sensory processing issues, stiffness in her extremities and delays in her cognitive functioning. As a result, A.S. required special therapy and handling techniques. Frankowski testified that it was essential that A.S. continue in therapy until she reached three years of age.
Frankowski testified that A.S.'s foster mother had initiated special services for her through the Cuyahoga County Board of Mental Retardation and Developmental Disabilities. As a result, A.S. was enrolled in physical and occupational therapy and Frankowski was assigned to assist the foster mother and appellant in learning how to recognize her needs and help her. Frankowski testified that she met with appellant on three occasions. According to Frankowski, although appellant initially seemed responsive and cooperative, she got the impression that appellant was not interested in her services because on at least one occasion, appellant just turned away and began talking to someone else while Frankowski was talking to her about A.S. Frankowski gave appellant her telephone number and told her that she could call anytime, but appellant never did so.
The foster mother testified that the children had been living with her and her husband since they were ten days old. She also testified that she had learned how to deal with A.S.'s special needs and that she and her husband would be willing to adopt the children.
D.S., the biological father of the children, testified that he and appellant never married and that he consented to permanent custody of CCDCFS so that the current foster parents could adopt the child. He testified further that even if the court did not grant permanent custody of the children to CCDCFS, he would not consent to appellant having custody of the children because appellant "gets easily frustrated" and "might just want to give up" when the twins got difficult. D.S. testified that he once heard appellant threaten to use a gun to get her children back and that appellant had also once threatened suicide.
Appellant testified that after living in a foster home for several years she was adopted at the age of eleven. Appellant testified that she graduated from high school, although she had a diagnosed learning disability and was in special education classes throughout school. Appellant testified that she "signed the rights over" for her first two children because she "had no money, no place to go, no car and no way to take care of them."
Appellant testified that she missed five parenting classes because she was in the hospital due to seizures caused by high blood pressure. According to appellant, she was not aware that she had not successfully completed the parenting class and that additional classes were recommended for her.
Appellant testified further that she went to May Dugan but did not receive any assistance there with finding housing. At the time of the hearing, she claimed she had been living in a two-bedroom apartment for approximately six months but, upon cross-examination, admitted that she had been living there for only three months. She also admitted that she was living there with two men, one whom she identified as Everett Wood, a former boyfriend and the man she referred to as her "stepfather," and Joseph Corson, whom appellant had married the day before the custody hearing and who she admitted had never met the children.
Appellant testified that since June 3, 2000, she had been working nights as a security guard making $8 per hour, but she planned to work the day shift if she received custody of the children. She testified that she would put the children in a daycare center down the street from her home. Appellant testified that she did not own a gun and denied ever telling anyone that she would use a gun to get her children back. Finally, appellant testified that she did not believe she needed counseling services.
On June 22, 2001, the trial court entered an order committing the children to the permanent custody of CCDCFS.
Appellant timely appealed, raising one assignment of error for our review. Appellant's assignment of error states:
 THE TRIAL COURT ERRED IN GRANTING PERMANENT CUSTODY SINCE (1) NONE OF THE CIRCUMSTANCES SET FORTH IN R.C. 2151.414(E) WERE PROVEN BY CLEAR AND CONVINCING EVIDENCE AND (2) THE JUDGMENT IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
The termination of parental rights in a natural child, when the child is neither abandoned nor orphaned, is governed by R.C. 2151.414(B), which provides that a court may grant permanent custody of a child to the agency if the court determines, by clear and convincing evidence,[1] that 1) it is in the best interest of the child to grant permanent custody of the child to the agency; and 2) the child cannot be placed with either of his parents within a reasonable period of time or the child should not be placed with his parents.
R.C. 2151.414(E) sets forth guidelines for determining whether a child cannot be placed with either of his parents within a reasonable period of time or should not be placed with his parents:
 In determining * * * whether a child cannot be placed with either of his parents within a reasonable period of time or should not be placed with his parents, the court shall consider all relevant evidence. If the court determines, by clear and convincing evidence * * * that one or more of the following exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either of his parents within a reasonable time or should not be placed with either parent.
The statute then lists various factors for the court to consider, including:
 (1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home.
Once the trial court finds from all relevant evidence that one of the factors exists and the child cannot or should not be placed with either of his parents, it then must consider whether permanent custody is in the best interest of the child. In re William S. (1996), 75 Ohio St.3d 95,99. In determining whether permanent custody is in the best interest of a child, R.C. 2151.414(D) requires the juvenile court judge to consider all relevant factors, including, but not limited to:
 (1) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster parents and out-of-home providers, and any other person who may significantly affect the child;
 (2) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
 (3) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies * * * for twelve or more months or a consecutive twenty-two month period * * *;
 (4) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;
 (5) Whether any of the factors in division (E)(7) to (11) of [R.C. 2151.414(E) apply in relation to the parents and child.
It is axiomatic that both the best interest determination and the determination that the child cannot be placed with either parent focus on the child, not the parent. In re Awkal (1994), 95 Ohio App.3d 309, 315. As this court stated in In re Awkal, supra:
 R.C. 2151.414(D) is written broadly and requires the juvenile court judge to consider all factors that are relevant to the best interest of the child. The purpose of a far-reaching inquiry is to allow the judge to make a fully informed decision on an issue as important as whether to terminate parental rights, privileges and responsibilities. The discretion which the juvenile court enjoys in determining whether an order of permanent custody is in the best interest of a child should be accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned. Moreover, the knowledge the juvenile court gains at the adjudicatory hearing through viewing the witnesses and observing their demeanor, gestures and voice inflections and using the observations in weighing the credibility of the proffered testimony cannot be conveyed to a reviewing court by a printed record. * * * Hence, this reviewing court will not overturn a permanent custody order unless the trial court has acted in a manner that is arbitrary, unreasonable or capricious. Id. at 316. (Citations omitted.)
Appellant asserts that the trial court erred in granting permanent custody of her children to CCDCFS because "none" of the factors set forth in R.C. 2151.414(E) was proven by clear and convincing evidence and the judgment was against the manifest weight of the evidence. We disagree.
In its order granting permanent custody to CCDCFS, the trial court found that the children could not or should not be placed with appellant because:
 following the placement of the children outside of the home and notwithstanding reasonable case planning and diligent efforts by the CCDCFS to assist the parents to remedy the problems that initially caused the children to be placed outside the home, the parents failed continuously and repeatedly to substantially remedy the conditions causing the children to be placed outside the home.
The record supports the trial court's finding.
The children were removed from appellant's care at the time of their birth because of appellant's emotional instability, her unstable and inappropriate housing and her lack of parenting skills. Shortly after their removal, CCDCFS developed a case plan for appellant to address these issues and enable the children to be returned to her custody. The case plan required her to learn proper parenting skills, maintain stable housing, obtain a psychological evaluation and address her emotional and mental health issues through individual counseling. Despite the efforts of CCDCFS, however, at the time of the permanent custody hearing, she had not successfully completed any of these objectives.
Contrary to appellant's argument, CCDCFS did, in fact, make diligent efforts to assist her in resolving her problems. Her social worker, Arlene Zemba, referred her to the May Dugan Social Services Center to obtain assistance with housing and individual counseling. The record indicates that she attended only one meeting at May Dugan, however, and then failed to return or take advantage of any of its referral services.
The record also reflects that appellant failed to obtain and maintain stable housing. During the eleven months following removal of the children from her care, appellant lived in at least five different locations, none of which were stable or appropriate. Furthermore, appellant failed to keep her social worker apprised of where she was living and, consequently, at the time of the permanent custody hearing, the social worker was unaware of where appellant was living. Although appellant testified that she was living in a two-bedroom apartment, she admitted that she had been living there for only three months, and further, that she lived there with two men, one a former boyfriend whom she referred to as her "stepfather," and the other a man she had married only the day before the custody hearing and who had never met the children. Appellant's intention was to have the children reside in the home with her and the men. This evidence was sufficient to demonstrate that appellant had failed to resolve her issues with unstable housing.
The record also demonstrates that appellant had not addressed her emotional and mental health issues. Dr. Anuszciewicz concluded that appellant suffered from a dependent personality disorder which made her unable to adequately care for her children without extensive, long-term individualized counseling. Although Zemba referred appellant to the May Dugan Social Services Center to obtain individualized counseling, however, she did not follow up on any of the services May Dugan offered. Significantly, she testified that she believed she did not need any counseling. Accordingly, the record reflects that appellant neither acknowledged her mental health issues nor attempted to address them in any way in order to regain custody of her children.
The record also reflects that appellant did not learn proper parenting skills — another objective of her case plan. Although she finally completed the sixteen-week parenting class after six months, her end-of-course ratings indicated that her parenting skills still needed improvement. Although both her instructor at the parenting classes and her social worker suggested that she take more parenting classes, appellant did not do so.
In short, the evidence adduced at the permanent custody hearing clearly and convincingly established that appellant had continuously and repeatedly failed to substantially remedy the conditions that led to the removal of her children from her custody. Accordingly, the trial court did not abuse its discretion in finding that the children could not or should not be placed with appellant.
Moreover, although appellant does not contest the trial court's finding with respect to the best interest of children, we note that the trial court also did not err in finding that awarding permanent custody of the children to CCDCFS was in their best interest. The record reflects that the children had been in their current foster home for nearly one year and the foster parents, who wanted to adopt both children, had learned how to care for A.S. and her special needs. Moreover, the guardian adlitem recommended that permanent custody be granted to CCDCFS. Accordingly, the trial court did not abuse its discretion in finding that permanent custody was in the children's best interest.
Appellant's assignment of error is overruled.
It is ordered that appellee recover of appellant costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the Common Pleas Court, Juvenile Court Division to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
MICHAEL J. CORRIGAN, J. and ANNE L. KILBANE, J., CONCUR.
[1] "Clear and convincing evidence" is defined as "[t]hat measure or degree of proof which is more than a mere `preponderance of evidence' but not to the extent of such certainty as is required `beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." Lansdowne v. Beacon Journal Publishing Co. (1987),32 Ohio St.3d 176, 180-181.